IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Cause No. 4:19CR740 RWS ) |
| MALIK ROSS, | ) ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM OF UNITED STATES
AND MOTION FOR UPWARD VARIANCE**

COMES NOW the United States Attorney, by and through Sayler A. Fleming, United States Attorney for the Eastern District of Missouri, and Allison H. Behrens, Assistant U.S. Attorney for said District, and provides the Court with the following information for purposes of the sentencing proceedings scheduled for February 16, 2021, and in support of its motion for upward variance.

**I.
PRESENTENCE INVESTIGATION REPORT**

The United States Probation Office ("USPO") issued its Final Presentence Investigation Report ("PSR") on February 9, 2021. The PSR notes that the Base Offense Level under the United States Sentencing Guidelines ("USSG") for a violation under 18 U.S.C. § 656 is 7. PSR ¶ 27. To this, 6 levels are added pursuant USSG § 2B1.1(b)(1)(D) because the loss was more than $40,000 but less than $95,000. PSR ¶ 28. Allowing for a two-level reduction for Acceptance of Responsibility, the Total Offense Level is 11. PSR ¶¶ 34, 35.

The PSR also assessed Defendant Malik Ross' ("Defendant") criminal history, finding that Defendant has no criminal history points. Thus, Defendant's Criminal History Category is I. PSR ¶ 39.

Based upon a Total Offense Level of 11 and a Criminal History Category I, the applicable advisory guideline range is 8 to 14 months. PSR ¶ 67. The crime to which Defendant has pleaded guilty, however, permits a maximum term of imprisonment of 30 years. PSR ¶ 66; 18 U.S.C. § 656.

The United States filed an acceptance to the PSR. In doing so, the United States recognizes that the guideline calculation set forth in the PSR is accurate based upon the facts the Defendant admitted to for purposes of his plea. However, the PSR does not reflect the full picture of this incident. The United States has consistently represented to the Court and defense counsel that it believes a greater sentence is warranted in this case due to the shooting of seven-year-old X.U. on August 12, 2019, which motivated the theft of $50,000 by Defendant from his employer on August 13, 2019. Therefore, the United States believes a substantial upward variance from the advisory guideline imprisonment range of 8-14 months is warranted.

## II.
## FACTS[1]

On August 12, 2019, Defendant Malik Ross was employed by Garda World Logistics ("Garda") in St. Louis, Missouri.[2] He arrived for work and completed a full workday. After work, he received a ride to Gus' Market, located at 1435 Destrehan Street. His purpose for going

---

[1] The United States anticipates it will establish the following facts by a preponderance of the evidence at the sentencing hearing scheduled for February 16, 2021, through both witness testimony and exhibits.

[2] Defendant had been employed by Garda for at least eight months. *See* PSR 59.

to the convenience shop was to purchase lottery tickets.  When Defendant entered Gus' Market, he was wearing a bullet proof vest, something he apparently regularly wore and was quite proud of.  He also had tucked in his waistband a loaded Glock firearm.  There were at least 15 rounds of ammunition in that firearm.

Defendant grew frustrated over his attempt to purchase lottery tickets, as the store owner apparently "messed up" his numbers.  This made Defendant angry and he left the store, intending to walk several blocks to a gas station located at 14th Street and Salisbury to purchase his lottery tickets. The path Defendant intended to take to the gas station proceeded a few blocks east on Destrehan to 14th Street, where he would make a left (heading north) for several blocks to Salisbury.

Witness K.W. was also at Gus' Market when Defendant entered.  She observed that Defendant was wearing a bullet-proof vest.  She left the store first, with Defendant walking behind her.  Like Defendant, she proceeded down Destrehan to 14th Street, where she turned left onto 14th Street.  When she turned onto 14th Street, she observed A.H. and M.P. (a minor) walking west across the street from 3504 N. 14th Street.  They had been on the porch of 3504 North Street charging their cellphones.

When Defendant turned the corner from Destrehan Street onto 14th Street, he also observed A.H. and M.P. leave the front porch of 3504 N. 14th Street.  Defendant claims the two males commented on his bullet-proof vest (although witness K.W. heard no such communication) and that one of them had a firearm and shot at Defendant, although he couldn't remember which one and changed his story repeatedly.  In response, Defendant retrieved his firearm from his waistband and proceeded to shoot a total of 14 times. He initially discharged his weapon six times in quick succession.   He did not aim precisely, simply shooting his weapon as

fast as he could while he ran down 14th Street before making a left into the north alley of Destrehan.  In fact, he told the police he was just firing "blindly."  Once in the alley, Defendant discharged his weapon another eight times.

With Defendant's initial volley of shots, Defendant hit A.H., who fled from the scene on foot.  A.H. ran from 14th Street to Destrehan, down Destrehan, across Destrehan to the alley behind 14th Street, and then collapsed in the rear yard of 3410 N. 14th Street. Fearing he was going to die because he was bleeding profusely, A.H. retrieved a firearm from his pants pocket and shot once in the air to draw attention to himself.  He was found, placed in an ambulance, and taken to the St. Louis University Hospital.  He survived.

With Defendant's random shooting, Defendant also hit seven-year-old X.U., who was playing in the alley behind his house at 3504 N. 14th Street. with his two sisters.  X.U. did not survive the shooting and was declared dead at Cardinal Glennon Hospital at 5:38 p.m.

Defendant did not call the police following the "shootout" to report that he had been shot at and had discharged his weapon in self-defense.  Instead, he called his aunt, co-defendant Shamekia Jackson.  He told her he had been involved in a "shootout" and asked her to come pick him up.  She did.

Although Defendant says he did not realize at the time that he had shot seven-year-old X.U. – which is likely, as there is nothing to suggest Defendant knew X.U. was in the vicinity when he was blindly shooting his weapon -- he was later watching the news and learned that a seven-year old boy had been killed at the scene of his shooting.  He realized at that time that he had shot and killed X.U.  However, instead of calling the police to report that he had been firing his weapon in self-defense, Defendant instead conspired with his aunt to get out of town.

4

The plan to leave town involved Defendant stealing money the next day from the Garda World Logistics armored vehicle he would be driving at work. To that end, co-defendant Jackson traveled to a Wal-Mart in Granite City, Illinois, and purchased two matching backpacks. She also purchased some toiletries for Defendant. In addition, Jackson traveled to her storage locker located and stored all of Defendant's clothing that he was not taking with him out of town. And, at some point between that evening and the time Defendant was arrested on August 14, 2019, Defendant disposed of his bullet-proof vest and firearm.

The next morning, August 13, 2019, Defendant arrived at work. As noted in his plea agreement, Defendant and another Garda employee were assigned to a particular Garda armored vehicle and proceeded to make several stops along their assigned route, either dropping money off or picking money up at various businesses. At one point, while Defendant's co-employee was inside the Panera located at 7th Street in the Soulard neighborhood, Defendant drove the Garda truck off of the business parking lot, ultimately driving on South Broadway.

While on South Broadway, Defendant stopped the vehicle in the middle of the road, opened the door to the Garda truck, removed a black bag from the Garda truck and placed the black bag in the middle of the road. He then returned to the Panera parking lot and picked up his co-worker to continue their assigned route. Shortly after Defendant left the black bag in the middle of the road, co-defendant Jackson drove her vehicle the opposite direction on South Broadway to the location of the black bag, stopped her vehicle in the middle of the road, opened her car door, retrieved the black bag from the street and left the area.

Later in the route, the co-employee entered another business establishment to deliver money. At that time, Defendant exited the armored vehicle and walked away, removing his Garda work shirt and stuffing it in a garbage can.

5

Defendant traveled to a relative's house where he spent the night. The next day, he was arrested for the theft of the money from Garda and taken into custody.

During the investigation that was conducted as a result of the killing of seven-year-old X.U., several relevant things were determined:

1. Although Defendant reported that one of the two individuals walking off the porch shot at him first before he opened fire, an audio-recording from a building next to the shooting established that there was no single shot fired before Defendant opened fire. Instead, Defendant shot six rounds in quick succession, followed by a brief pause, and then another eight rounds. Following that, a longer pause occurred, followed by a distant single shot (which was the shot fired from victim A.H. from several blocks away).

2. Ten spent cartridge shells were located and retrieved by law enforcement during the investigation of the crime scene. Defendant admitted to law enforcement that he fired his weapon approximately 14 times, leaving just one cartridge in his weapon. Six of those shells were retrieved from where Defendant was standing when he rounded the corner onto 14th Street, saw the two males and opened fire. Four of those shells were retrieved from the alley Defendant admitted he ran down after he opened fire. A ballistics examination of all those shells revealed that they came from the same firearm, a Glock.

3. Victim X.U.'s father was interviewed by law enforcement. He provided officers with a spent shell casing that he located after the officers had released the crime scene. A comparison of that shell casing with the other retrieved casings revealed it was a match with those casings. Thus, 11 total shell casings were ultimately retrieved and determined to have been fired from the same gun.

4. After law enforcement officers interviewed Defendant and learned he was claiming that either A.H. or M.P. shot at him first, they took a firearms canine to the sight and conducted a sweep of the area looking for an additional shell casing to support Defendant's story. The canine located no cartridges.

5. Defendant admitted to police that he had a Glock firearm, although, conveniently, he could not remember the caliber and did not know what happened to it after the shooting. While a Glock was recovered near victim A.H., ballistics examination establishes that the retrieved shell casings did not come from that firearm.

6. There was a direct and unimpeded pathway from where Defendant opened fire initially to where seven-year-old X.U. was walking in the back alley. There was no such sight line from either victim A.H. or M.P, even had there been evidence that one of those two had fired a weapon. There can be no dispute that victim X.U. was hit by Defendant Malik Ross's firearm.

7. There is not a single shred of evidence that Defendant acted in self-defense. There is no evidence that A.H. or M.P. shot first, or at all even, despite Defendant's allegations to the contrary. There is no evidence, other than Defendant's statement, that either A.H. or M.P ever displayed a weapon at him. Both A.H. and P.M. informed police that neither had a firearm displayed. Additional witnesses to the incident support this. Further, A.H. told police that he had his phone and charger in his hand when he was coming off the porch, not a firearm. This is borne out by the crime scene photographs which show A.H. had dropped his phone and charger, both of which were covered with blood, as he was fleeing from Defendant after being shot by him.

8. Although Defendant claimed he shot in self-defense, his conduct subsequently did not support that. First, he fled the scene instead of calling the police following the shooting.

7

Even after he saw on the news that one of his bullets had killed X.U., he did not call the police. Second, his firearm disappeared after the shooting, which is far more indicative of guilt and wrongdoing than it is of self-defense. Third, when Defendant Ross was interviewed by police, his ever-changing and inconsistent statements to the police did not comport with the conduct usually exhibited by people who had shot in self-defense.

### III.
### THE COURT IS PERMITTED TO CONSIDER ALL OF THIS EVIDENCE IN IMPOSING AN UPWARD VARIANCE

In determining the particular sentence to be imposed, the Court shall consider several factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed a) to reflect the seriousness of the offense, to promote respect for the law and to provide punishment for the offense, b) to afford adequate deterrence to criminal conduct, c) to protect the public from further crimes of the defendant, and d) to provide the defendant will needed training, medical care or other treatment; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for that particular crime; (5) any pertinent policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

In analyzing the § 3553(a) factors, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. "Under an advisory sentencing regime, 'the district court is entitled to determine sentences upon judge-found facts and uncharged conduct' where the defendant is

8

'not sentenced in excess of the statutory maximum.'" *United States v. Bridges*, 569 F.3d 374, 377 (8th Cir. 2009) (quoting *United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006)).

Sentencing courts have "wide discretion at sentencing as to the kind of information considered or its source." *United States v. Pratt*, 553 F.3d 1165, 1170 (8th Cir. 2009). A court may consider all relevant evidence at sentencing, regardless of its admissibility under the rules of evidence, provided that the evidence has "sufficient indicia of reliability." *United States v. Ortiz*, 636 F.3d 389, 393 (8th Cir. 2011). The evidence need not be limited to evidence related to the scope of the crimes charged and may include "uncorroborated hearsay, provided the defendant is given a chance to rebut or explain it." *Pratt*, 553 F.3d at 1170 (quoting *United States v. Atkins*, 250 F.3d 1203, 1213 (8th Cir. 2005)).

Recently, the Eighth Circuit considered a case with a fact pattern similar to the instant case. In *United States v. Montano*, 961 F.3d 1008 (8th Cir. 2020),

> [t]he prosecution arose from a report that Montano committed acts of domestic violence against his wife, Thantchaporn Thongbai, in Tama, Iowa. After several months of a tumultuous marriage, Thongbai left Montano in July 2018. She reported to police that Montano had violently assaulted her, provided photographs of her injuries, and informed police that Montano kept drugs and guns in his residence.
>
> Police arrested Montano for assault, and they found 1,000 rounds of ammunition and three loaded firearms in his residence. A grand jury charged Montano with unlawful possession of a firearm as a person previously convicted of a misdemeanor crime of domestic violence.

*Montano*, 918 F.3d at 1011.

At sentencing, the district court heard testimony and concluded that Montano had assaulted his wife in July 2018. *Id.* The court deemed Montano's theory of self-defense incredible. *Id.* The district court calculated the applicable guideline range and then varied upward from the guideline

9

range, finding that "Montano's assault of his wife, and an assault of an inmate in jail while awaiting sentencing, were not accounted for by the guidelines." *Id.*

On appeal, the Eighth Circuit Court of Appeals found it proper for the district court to vary upward because of "assaultive conduct even though the government could not prosecute the assault as a crime in federal court." *Montano*, 961 F.3d 1008 at 2013. Even though the assault was not related to the illegal possession of a firearm, the Eighth Circuit concluded that the defendant's assault was "plainly material to the court's sentencing determination under § 3553(a)." *Id*.

The testimony the United States intends to present to the Court is clearly material to the Court's sentencing determination under § 3553(a). Defendant's conduct on August 12, 2019, when he opened fire in a residential area and fired "blindly" fourteen times is conduct this Court can and should consider. That reckless conduct resulted in the needless death of a seven-year-old boy. It was that conduct that motivated Defendant to steal $50,000 from Garda the next morning. This is conduct that is not accounted for in reaching an applicable guideline range of 8-14 months but is certainly indicative of Defendant's history and characteristics and is relevant to the nature and circumstances of the offense.

## IV.
## CONCLUSION

For all the reasons set forth above, the United States respectfully requests that the Court grant the Government's motion for an upward variance from the present applicable guideline range of 8-14 months to account for the conduct of Defendant on August 12, 2019, resulting in the death of a seven-year-old boy. While the Government is not requesting a specific sentence,

deferring instead to the Court after the consideration of all the evidence, the Government believes a *substantial* upward variance from the applicable guideline range is clearly warranted.

        Respectfully submitted,

        SAYLER A. FLEMING
        United States Attorney

        s/ *Allison H. Behrens*
        Allison H. Behrens, #38482 MO
        Assistant United States Attorney
        111 South 10th Street, Room 20.333
        St. Louis, Missouri 63102
        (314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2021, the foregoing was filed electronically with the Clerk of the Court and served by way of this Court's Electronic Notification System upon the attorney for the defendant, Beverly Beimdiek..

        /s *Allison H. Behrens*
        Allison H. Behrens, #38482 MO
        Assistant United States Attorney